[No. B025012. Second Dist., Div. One. Oct. 27, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
AVRAHAM LUGASHI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts 3 through 5 are not certified for publication..

## COUNSEL

Fischer & Multhaup and Dennis A. Fischer, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey, Robert C. Schneider and Carolyn D. Fuson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ORTEGA, J.**—Avraham Lugashi appeals from the judgment (order granting probation) entered following his conviction by the court of grand theft of more than $25,000, and four counts of receiving payment for items falsely represented to credit card issuers as having been furnished. (Pen. Code, §§ 487, subd. 1, 12022.6, 484h, subd. (b).) He contends: "I. The Trial Court Prejudicially Erred in Finding the Prosecution's Foundational Showing Sufficient to Admit Wells Fargo Bank's Computer-Generated Evidence Under Evidence Code Section 1271"; "II. Appellant Was Deprived of His State and Federal Constitutional Rights to a Jury Trial by the Defective Jury Waiver Entered Prior to His Trial by the Court"; "III. The Court Should Have Granted the Motion for Judgment of Acquittal (Penal Code § 1118) Based on Insufficiency of the People's Evidence to Sustain the Charged Offenses"; and "IV. Appellant Cannot Be Convicted for Offenses Under Both Penal Code Section 487 (Grand Theft) and Penal Code Section 484H, Subd. (B) (Credit Card Fraud)."

As discussed below, appellant's contentions lack merit. As discussed in section 5 below, the judgment is modified to stay execution of the concurrent probationary sentence imposed in count II. In all other respects, the judgment (order granting probation) is affirmed.

### 1. FACTS

Viewed in accordance with the usual rules governing appellate review (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d

110]), the evidence established that in June 1984, six computer tapes containing complete account information for up to 60,000 Bank of America Visa credit card customers were stolen. The stolen information was copied, sold, and reproduced into counterfeit credit cards. The counterfeit cards appeared similar to genuine cards, but lacked certain embossed symbols and the magnetic strip containing correct account information for the actual customers. Between September 12 and October 16, 1984, 44 fraudulent charges totaling over $67,000 were made at appellant's oriental rug stores using counterfeit credit cards without knowledge or consent of the legitimate account holders. Appellant admitted to the police making the sales or completing the paperwork on 37 of those charges.

None of the charges were made by the actual account holders. Moreover, in the expert opinion of Los Angeles Police Department Bunco Forgery Detective Richard Levos, Wells Fargo Bank Special Agent Robert Dodd, and Wells Fargo Loss Control Specialist Jean Norris (Norris), many of appellant's admitted transactions involved additional indicia of fraud. All had invalid identifying drivers license numbers. Twice, large charges were made on the same account on the same or following day at different branches of appellant's business. There were at least 13 instances of double invoicing, i.e., 2 large charges on the same account on the same day. One account incurred two large charges on successive days, with obviously different signatures and drivers license numbers. At least 10 of the transactions involved "fishing," seeking and being refused credit authorization on an account, then resubmitting the request for increasingly lower amounts until approval is obtained. "Fishing" is officially discouraged by credit card issuers, who instruct merchants to refuse any card once credit authorization is refused. One of appellant's sales was for $1,275 although the credit authorization response indicated the card was fraudulent, lost, or stolen, should be retained by the merchant, and approval was given for only $12.75. Although some of this activity could be consistent with legitimate purchases, Wells Fargo viewed it with suspicion, especially as 44 fraudulent transactions occurred at appellant's business in 5 weeks.

At the time of the alleged "sales," these transactions were entered at appellant's stores on a credit card verification terminal and simultaneously recorded electronically on computers maintained by the issuing banks, third party companies which conduct verification for banks, and Wells Fargo, with which appellant maintained an account into which all credit card sales were deposited. Wells Fargo recouped its losses from residual funds in appellant's account.

A merchant accesses account information by either "swiping" or running the card through a slot on the terminal which automatically reads the

information encoded on the magnetic strip, or manually "punching" account information into the terminal keyboard. "Swiping" is more frequent because it is faster and more accurate. Counterfeit cards cannot be "swiped" because they lack proper magnetic strips. All the fraudulent charges made at appellant's stores were accessed by "punching."

Each night, Wells Fargo runs a program known as a "dump" which reorders the entries by customer and merchant account numbers. Shortly thereafter, a tape is made of the "dump" from which a microfiche record is prepared and maintained. Although the actual merchant and bank copies of the fraudulent charges, deposit slips, and appellant's sales invoices were entered in evidence, the merchant queries and system responses were gleaned from printed copies of the microfiche.

Most of the description of the means by which transaction information is generated and recorded, as well as interpretation of the records, came from Norris. She worked for five years in credit card fraud and loss control investigation. All the records were generated by Wells Fargo. Although not a computer expert, she worked with those who did the "dumps," produced the tapes and microfiche, and maintained the microfiche records, and was familiar with the system. She personally produced the offered documents from the microfiche records and knew how to interpret them. Norris collected the bank and merchant copies of the fraudulent transactions and compared them with lists of counterfeit and stolen accounts, as well as with the computer records. No evidence was offered regarding the computer hardware or software, its maintenance or reliability, or any system of internal checks.

On October 23, 1984, Detective Levos served a search warrant on appellant's business during which Betty Strogatz, appellant's bookkeeper, told him the business was changing inventory systems and she could not determine whether any particular carpet was still in stock, or its location in any of appellant's branch stores. As a result, Detective Levos was unable to determine whether carpets allegedly sold in the fraudulent transactions remained in appellant's possession. No counterfeit credit cards or other physical evidence of fraud were found. Appellant claimed the sales were legitimate.

In defense, Ms. Strogatz denied telling Detective Levos she could not trace particular carpets, and claimed a subsequent inventory disclosed that none of the rugs involved in the fraudulent transactions were at the main Sherman Oaks store. She did not know whether those carpets were at appellant's other stores or home. Appellant's partner claimed that while salesmen normally completed paperwork on their sales, someone else might

do so during busy periods. Two of appellant's salesmen claimed "fishing" was a standard sales technique. Jack Ross, representative of the company which provided appellant's terminal, corroborated Norris's explanation of the process by which authorization requests and responses are recorded by computer. Appellant, who did not testify, did not challenge the accuracy of the computer records, but argued the evidence was consistent with innocent behavior. Appellant argued he was victimized by counterfeit card producers who posed as legitimate customers, and to whom he sold merchandise for each fraudulent transaction.

Appellant's objection to introduction of the computer generated records because an inadequate foundation had been laid under the business records exception to the hearsay rule codified in Evidence Code section 1271 was overruled. Appellant claimed Norris lacked sufficient knowledge to explain the computer records, and that respondent failed to offer evidence on the reliability of the hardware and software used by Wells Fargo. Appellant's renewed objections during his motion for acquittal pursuant to Penal Code section 1118 and his new trial motion also were denied.

Appellant and his counsel waived jury trial. At his new trial motion, appellant claimed his jury waiver was defective and introduced his trial counsel's declaration that, although he had practiced law for 15 years, he had no felony jury trial experience. He recommended a jury waiver based on conversations with three public defenders familiar with the trial judge who were confident Judge Albracht was the best judge in the courthouse before whom to waive jury. The motion was denied.[1]

---

[1] The waiver resulted from the following colloquy: "[The court]: . . . The matter is here for trial. There has been a discussion of there being a court trial. I think we have not yet taken a waiver.

"[Defense counsel]: We have not, Your Honor. There will be a jury waiver . . . .

"[The prosecutor]: . . . Mr. Lugashi, do you understand you have a right to have a trial by court or jury?

"[A] Yes.

"[Q] Do you understand the difference?

"[A] Yes.

"[Q] Is it your desire to waive your right to trial by jury and have this case tried by the court?

"[A] Yes.

"[Q] Counsel join?

"[Defense counsel]: Counsel joins.

"[The prosecutor]: People join in the jury waiver also.

"[The court]: The court will accept the waiver."

During appellant's new trial motion, the trial court noted: "I was negotiating with Mr. Popkoff [appellant's trial counsel] and Mrs. Elliott [the prosecutor] during the time there was a discussion of the possibility of a jury waiver. It was clear to me that Mr. Popkoff understood w[hat] a jury waiver was. [¶] We discussed it at great length. As we would discuss it, he would go outside and speak to his client. We put the matter over, as a matter of fact, for

Appellant's new trial motion based on insufficiency of the evidence and that he could not be convicted of both grand theft and credit card fraud also was denied.

## 2. THE COMPUTER DATA WAS PROPERLY ADMITTED AS A BUSINESS RECORD

■ Appellant contends the trial court abused its discretion in admitting the computer data under the business records exception to the hearsay rule codified in Evidence Code section 1271.[2] Claiming California courts have yet to address this issue, appellant relies on authority from other states and commentaries to urge us to adopt a test requiring the proponent of computer evidence to introduce testimony on the acceptability and reliability of the particular hardware and software, as well as internal maintenance and accuracy checks, as a prerequisite to admissibility under Evidence Code section 1271. Appellant argues that respondent produced no evidence regarding Wells Fargo's hardware, software, or its maintenance and accuracy, and that Norris lacked sufficient personal knowledge to support her testimony. Appellant concludes that, as respondent failed to meet his proposed standard, the trial court abused its discretion in admitting the evidence and we must reverse.

Appellant's contention is unpersuasive. Other California courts, albeit summarily, previously rejected similar claims. Moreover, the majority of other states and some federal courts rejected similar proposals, adopting a better reasoned and more realistic test for admissibility of computer evidence. We agree with these courts and adopt a similar test which, applied to these facts, demonstrates the validity of the trial court's decision admitting the challenged evidence. In any event, on this record, even if we adopted appellant's proposal, reversal is not required.

■ In reviewing the trial court's admission of the computer evidence, we acknowledge its wide discretion in determining whether sufficient foun-

several days for he and his client to have time to discuss the decision as to whether or not to waive. I wasn't a party obviously to those discussions, but at the conclusion of those discussions Mr. Popkoff came back and said yes, he and his client did want to waive. [¶] There seemed to me to be very sound and well thought out and ongoing discussions of that issue between Mr. Popkoff and his client, alb[ei]t outside of my presence. [¶] Thereafter, at the time of the waiver, I was present; Mr. Popkoff and Mr. Lugashi appeared to understand everything that was said during this brief colloquy . . . ."

[2] Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

dation is laid to qualify evidence as a business record. On appeal, exercise of that discretion can be overturned only upon a clear showing of abuse. (*County of Sonoma* v. *Grant W.* (1986) 187 Cal.App.3d 1439, 1450-1451 [232 Cal.Rptr. 471]; *Trans-World Airlines, Inc.* v. *Alitalia-Linee Aeree Airlines* (1978) 85 Cal.App.3d 185, 192 [149 Cal.Rptr. 411].)

Appellant primarily relies on three Illinois cases which adopt his proposed standard: "In Illinois, computer-generated business records are admissible under the business records exception to the hearsay rule if a proper foundation has been laid. To establish a foundation, it must be shown that the computer equipment is standard, that the entries are made in the regular course of business at or reasonably near the time of the happening of the event recorded, and that the sources of information and the method and time of preparation are such as to indicate trustworthiness and justify admission." (*People* v. *Bovio* (1983) 118 Ill.App.3d 836 [455 N.E.2d 829, 833]; see also *People* v. *Mormon* (1981) 97 Ill.App.3d 556 [422 N.E.2d 1065, 1072-1073]; *People* v. *Boyd* (1978) 66 Ill.App.3d 582 [384 N.E.2d 414, 420], and cases cited therein.)

None of these cases, however, support appellant's claim that the foundation produced in this case was so deficient as to require reversal. The *Boyd* court found the erroneous admission of computer evidence harmless and affirmed the conviction.

The *Mormon* court upheld admission of computer evidence despite the absence of any testimony regarding the hardware, software, or its reliability, maintenance, and accuracy, found any conceivable error harmless, and affirmed the conviction. Of particular relevance, the court stated: ". . . the simultaneous recording of information on the car rental agreement form and its entry in the computer reduced the probability of error through human handling. . . . Moreover, we believe that the fact that the Avis computer was used to retrieve information rather than perform calculations necessitates less scrutiny into the nature of the computer." (*People* v. *Mormon, supra,* 422 N.E.2d at p. 1073.)

Finally, although the *Bovio* court reversed the conviction due to erroneous admission of computer evidence, it did so primarily because "[s]ystems, like the one apparently in question, which perform calculations must be scrutinized more thoroughly than those systems which merely retrieve information." (*People* v. *Bovio, supra,* 455 N.E.2d at p. 833.)

■ Analysis of appellant's other cases likewise discloses that, on this record, reversal is not compelled.[3]

■ Appellant's proposed test incorrectly presumes computer data to be unreliable, and, unlike any other business record, requires its proponent to disprove the possibility of error, not to convince the trier of fact to accept it, but merely to meet the minimal showing required for admission. If applied to conventional hand-entered accounting records, appellant's proposal would require not only the testimony of the bookkeeper records custodian, but that of an expert in accounting theory that the particular system employed, if properly applied, would yield accurate and relevant information.

Moreover, appellant assumes that only a computer expert, who could personally perform the programming, inspect and maintain the software and hardware, and compare competing products, could supply the required testimony. However, a person who generally understands the system's operation and possesses sufficient knowledge and skill to properly use the system and explain the resultant data, even if unable to perform every task from initial design and programming to final printout, is a "qualified witness" for purposes of Evidence Code section 1271.

Finally, with due respect to the learned commentators who have analyzed this issue at their leisure,[4] appellant's proposal could require production of a horde of witnesses representing each department of a company's data processing system, not to rebut an actual attack on the reliability of their data, but merely to meet the minimal requirement for admissibility. In this case, Norris indicated each operation was performed by a different unit. Unless a single person possessed sufficient theoretical knowledge of the particular hardware, software, and its maintenance and reliability, and the physical ability to perform each operation, at least three additional witnesses would be required: one who ran the "dump," one who produced the microfiche, and one who maintained the microfiche records. The time required to produce this additional testimony would unduly burden our already crowded trial courts to no real benefit. Moreover, while Wells Fargo may possess the resources to produce such a phalanx of witnesses without ceasing normal activity, small businesses, equally dependent on computer operations, do

---

[3] *Vining* v. *State Farm Life Ins. Co.* (La.App. 1982) 409 So.2d 1306; *American Oil Company* v. *Valenti* (1979) 179 Conn. 349 [426 A.2d 305]; *O'Shea* v. *International Bus. Machines Corp.* (Tex.Civ.App. 1979) 578 S.W.2d 844; *Monarch Federal Sav. & Loan Ass'n.* v. *Genser* (1977) 156 N.J.Super. 107 [383 A.2d 475]; *Railroad Commission* v. *Southern Pacific Company* (Tex.Civ.App. 1971) 468 S.W.2d 125; *King* v. *State* ex rel. *Murdock Acceptance Corp.* (Miss. 1969) 222 So.2d 393.

[4] See, among others, Peritz, *Computer Data and Reliability: A Call for Authentication of Business Records Under the Federal Rules of Evidence* (1986) 80 Nw.U. L.Rev. 956; Roberts, *A Practitioner's Primer on Computer-Generated Evidence* (1974) 41 U.Chi. L.Rev. 254.

not. Especially where, as here, the business producing the records is neither party to the litigation nor interested in the outcome, common sense compels rejection of such a requirement.

In applying Evidence Code section 1271 to Norris's testimony, appellant, although challenging her qualifications to offer any foundational evidence, acknowledges that the computer entries of merchant queries and system responses memorialized in the printout were made as they occurred in the regular course of business. Indeed, although describing a somewhat different system, his own witness Ross corroborated Norris on this point. Thus, appellant does not seriously dispute that the first two statutory requirements were met.

Appellant argues that, while Norris identified the record and explained its mode of preparation, she was neither the custodian nor a qualified witness, and that the third statutory requirement was not satisfied. Norris admitted she was neither an official custodian of the records nor a computer expert. In essence, appellant claims Norris was incompetent to offer this testimony because she could not explain or evaluate Wells Fargo's hardware or software and could not physically perform each process from initial query to final printout. Appellant argues that Norris could not rely on hearsay and could testify only from personal knowledge.

Appellant's argument is incorrect. Norris was an experienced credit card fraud investigator familiar with merchant authorization terminals, counterfeit cards, credit card sales, and the manner in which sales are recorded. She personally produced the printed records from the microfiche. Although she did not do the "dump" or physically convert the resulting tape into microfiche, she worked and spoke with those who did. She understood the records and interpreted them in great detail. She assembled the bank copies of the actual charges and compared them with the computer records. That some of her knowledge came from "hearsay" discussions with fellow workers employed and trained by the bank and its computer component suppliers no more renders her testimony incompetent than if it resulted from reading "hearsay" information manuals from the hardware or software manufacturers or Wells Fargo computer management. If appellant were correct, only the original hardware and software designers could testify since everyone else necessarily could understand the system only through hearsay.

If there were any question about the competence of the bank's other employees, they could be subpoenaed and examined. Much of the information on the printout could be verified by comparison with the bank copy of the actual charges. While Norris's testimony might not convince a fact

finder of the records' accuracy beyond a reasonable doubt, it was more than adequate to render them admissible.

Appellant combines two claims in urging that the final statutory requirement was not met. He essentially repeats his assertion that Norris's testimony was incompetent and that the sources of information and method and time of preparation therefore were suspect. Appellant also contends that testimony on the acceptability, accuracy, maintenance, and reliability of the bank's computer hardware and software should have been produced. As discussed above, both contentions are meritless, especially where, as here, the data consists of retrieval of automatic inputs rather than computations based on manual entries. As all the statutory requirements for admissibility were satisfied, there was no abuse of discretion and the evidence was properly admitted.

Contrary to appellant's assertion, California courts previously addressed this issue, and, somewhat summarily, rejected similar contentions. (*People* v. *Cohen* (1976) 59 Cal.App.3d 241, 249 [130 Cal.Rptr. 656]; *People* v. *Dorsey* (1974) 43 Cal.App.3d 953, 960-961 [118 Cal.Rptr. 362].) Even where, unlike here, bank data involved computation as well as retrieval, bank computer records were properly admitted without the additional showing urged by appellant.

"[W]e believe that bank statements prepared in the regular course of banking business and in accordance with banking regulations are in a different category than the ordinary business and financial records of a private enterprise. It is common knowledge that bank statements on checking accounts are prepared *daily* and that they consist of debit and credit entries based on the deposits received, the checks written and the service charges to the account. We fail to see where appellant has been prejudiced by the absence of testimony as to the 'method' of preparation of the records, i.e., whether by hand or by computer and from what sources. Such testimony would not have a bearing on the basic trustworthiness of the records. While mistakes are often made in the entries on bank statements, such matters may be developed on cross-examination and should not affect the admissibility of the statement itself." (*People* v. *Dorsey, supra,* 43 Cal.App.3d at pp. 960-961.)[5]

Although in a different context, Evidence Code section 1500.5 presumes that such evidence is sufficiently reliable to cross the minimal threshold of admissibility, especially, as here, absent any attack on its accuracy.[6]

---

[5] We are unpersuaded by one commentator's criticism of this portion of *Dorsey*. (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 4.1, pp. 226-228.)

[6] Evidence Code section 1500.5 provides in relevant part: "[A] printed representation of computer information . . . which is being used by or stored on a computer or computer read-

Moreover, the bulk of other jurisdictions addressing this issue adopted similar analyses and upheld admission of computer records with similar or less extensive foundational showings over similar objections. (*United States v. De Georgia* (9th Cir. 1969) 420 F.2d 889, 893-894 (rental car company record admitted despite no evidence regarding hardware, software, maintenance, or internal accuracy tests); *Merrick v. United States Rubber Co.* (1968) 7 Ariz.App. 433 [440 P.2d 314, 316-317] (plaintiff's records of defendant's debts admitted despite no evidence regarding computer operation); *State v. Veres* (1968) 7 Ariz.App. 117 [436 P.2d 629, 637-638] (bank records admitted despite assistant cashier's testimony that records were prepared by "automatic machine" whose operations he did not understand, and he only had access to the records and did not produce them); *Smith v. Bank of the South* (1977) 141 Ga.App. 114 [232 S.E.2d 629, 630] (bank records); *Hill v. State* (Miss. 1983) 432 So.2d 427, 440 (shipping company record admitted although manager knew nothing about its preparation, but it was a business record with which he had daily contact and upon which he and his company relied); *State v. Watson* (1974) 192 Neb. 44 [218 N.W.2d 904, 905-907] (bank records admitted without testimony regarding reliability and accuracy of system as bank not party to litigation and had no claim against defendant); *State v. Passmore* (1978) 37 N.C.App. 5 [245 S.E.2d 107, 109] (bank records); *State v. Stapleton* (1976) 29 N.C.App. 363 [224 S.E.2d 204, 204-205] (airline reservation record admitted although passenger service supervisor not computer expert and offered no testimony regarding system, but was familiar with and knew business relied on it, entries made as business records at time of event, and could interpret printout); *Endicott Johnson Corporation v. Golde* (N.D. 1971) 190 N.W.2d 752, 756-757 (account records admitted although local company representative who did not prepare records produced out of state was unfamiliar with computer operation but familiar with records); *Hutchinson v. State* (Tex.App. 1982) 642 S.W.2d 537, 538 (record of gasoline pumping admitted despite no evidence whether computer functioning properly); *Westinghouse Elec. Supply Co. v. B.L. Allen* (1980) 138 Vt. 84 [413 A.2d 122, 132-133] (lack of

---

able storage media shall be admissible to prove the existence and content of the computer information . . . . [¶] Computer recorded information . . ., or copies of computer recorded information . . ., shall not be rendered inadmissible by the best evidence rule. Printed representations of computer information . . . will be presumed to be accurate representations of the computer information . . . that they purport to represent. This presumption, however, will be a presumption affecting the burden of producing evidence only. If any party to a judicial proceeding introduces evidence that such a printed representation is inaccurate or unreliable, the party introducing it into evidence will have the burden of proving, by a preponderance of evidence, that the printed representation is the best available evidence of the existence and content of the computer information . . . that it purports to represent."

evidence regarding computer operation and other alleged foundational shortfalls go to weight, not admissibility, where witness generally familiar with accounting procedures and particular account); *State* v. *Kane* (1979) 23 Wn.App. 107 [594 P.2d 1357, 1360-1361] (bank records admitted despite no evidence regarding hardware, software, or program reliability, although normally required, where bank large and well known and no challenge to records' accuracy).)

■ In any event, even if we adopted appellant's proposed test, which we decline to do, on this record reversal is not required. Much of the evidence was based as much on the physical evidence of merchant and bank copies of the charges and appellant's invoices as on the computer records. Double invoicing, charges at different stores, use of different signatures, use of fraudulent license numbers, a large charge on an invalid account all were documented by physical evidence independent of the computer records. This evidence was admissible even if the computer records had been excluded.

Moreover, appellant never challenged the accuracy of the information contained in the printout. Appellant essentially admitted the accuracy of all the information, but claimed it was consistent with his innocent victimization by holders of counterfeit credit cards.

Thus, there was no abuse of discretion and the challenged evidence was properly admitted. Moreover, as much of the evidence was otherwise admissible, and appellant never challenged the printout's accuracy, reversal in any event is not required.

3.-5.*

· · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The judgment is modified to stay the concurrent probationary sentence imposed on count II, the stay to become permanent upon completion of the

---

* See footnote, *ante,* page 632.

sentence imposed on count I. In all other respects, the judgment (order granting probation) is affirmed.

Hanson (Thaxton), Acting P. J., and Devich, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 16, 1989. Mosk, J., was of the opinion that the petition should be granted.